IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

CALVIN SMITH DAVIS,

        Petitioner,

    v.

MARK NOOTH,

        Respondent.

Civil No. 2:11-cv-01101-BR

OPINION AND ORDER

KENDRA M. MATTHEWS
Ransom Blackman, LLP
1001 SW Fifth Avenue
Suite 1400
Portland, OR  97204

        Attorney for Petitioner

ELLEN F. ROSENBLUM
Attorney General
KRISTEN E. BOYD
Assistant Attorney General
Department of Justice
1162 Court Street NE
Salem, OR  97301

        Attorneys for Respondent

1 - OPINION AND ORDER -

BROWN, Judge.

Petitioner, an inmate at the Snake River Correctional Institution, brings this habeas corpus action pursuant to 28 U.S.C. § 2254.  For the reasons that follow, the Court DENIES the First Amended Petition Under 28 U.S.C. § 2254 for Writ of Habeas Corpus (#29).

<u>**BACKGROUND**</u>

On August 23, 2002, a Multnomah County grand jury indicted Petitioner on the following charges:  Count 1 - Aggravated Murder (murder in the course of committing the crime of Robbery in the First Degree); Count 2 - Aggravated Murder (murder in the course of committing the crime of Burglary in the First Degree); Count 3 - Aggravated Murder (murder in the course of committing the crime of Kidnapping in the Second Degree); Count 4 - Aggravated Murder (murder in an effort to conceal the identity of a perpetrator of the crime of Robbery in the First Degree); Count 5 - Aggravated Murder (murder in an effort to conceal the identity of a perpetrator of the crime of Burglary in the First Degree); Count 6 - Aggravated Murder (murder in an effort to conceal the identity of a perpetrator of the crime of Kidnapping in the Second Degree); Count 7 - Robbery in the First Degree with a Firearm; Count 8 - Burglary in the First Degree with a Firearm; Count 9 - Kidnapping in the Second Degree with a Firearm; Count 10 - Unauthorized Use of a Vehicle with a Firearm; Count 11 - Unauthorized Use of a

2 - OPINION AND ORDER -

Vehicle with a Firearm; and Count 12 - Felon in Possession of a Firearm. Resp. Exh. 103. The first three counts of Aggravated Murder charged Petitioner with personally and intentionally causing the death of the victim, while Counts 4-6 charged Petitioner with Aggravated Murder in an effort to conceal the identity of the perpetrator.

On August 20, 2000, Wayne Olson contacted Jessica Rydman, an exotic dancer and prostitute, and requested that she perform services for him at her home. After Ms. Rydman left Olson's residence, she contacted Petitioner, who was her boyfriend. Rydman told Petitioner she had been in Olson's home in the West Hills of Portland, that he was a banker, and that he had a lot of money, jewelry, a Rolex watch, and maybe a safe. Petitioner decided to rob Olson, with the help of Rydman and Medero Moon, a 17-year-old acquaintance.

Petitioner, Rydman, and Moon returned to Mr. Olson's home. The plan was for Rydman to knock on the front door and pretend that she had accidentally left something in the house. She did this, and when Olson opened the door to Rydman, Petitioner and Moon forced their way into the house and ordered Olson to the floor at gunpoint. Petitioner and Moon took turns watching Olson; while one watched, the other helped Rydman search the house for valuables, which they loaded into pillowcases.

As Petitioner and Rydman left the house, Rydman gave the gun to Moon and, according to statements given by Moon to investigating officers, Petitioner told Moon "that he knew what he had to do and that he had to kill the [decedent]." Trans., Vol. 7 at 180.  Moon shot Mr. Olson in the back of the head.

The three fled the scene in two of Olson's vehicles and Rydman's car.  Early the next morning, the trio ditched the stolen cars.  A few days later, they fled the state, spending time in Los Angeles and Las Vegas, before returning to Portland.  Eventually, Rydman turned herself in and cooperated with police.  In exchange for testifying against Petitioner, Rydman was allowed to plead guilty to Robbery, Kidnapping, and Burglary, and was sentenced to seventeen years in prison.

Moon also agreed to cooperate with police.  He gave several statements to police and entered into a cooperating-witness agreement.  As Petitioner's trial neared, however, the prosecution suspected Moon would renege on the agreement and refuse to testify.  Fearing such an eventuality, the prosecution filed a pre-trial motion to admit Moon's previous statements to law enforcement officials.

At the pretrial hearing, Petitioner objected to the introduction of the out-of-court statements on hearsay and Confrontation Clause grounds.  The trial judge overruled the objection.  Petitioner sought reconsideration, which the trial

judge granted, and upon reconsideration the trial judge again overruled the objections.

The case proceeded to trial before a jury. As suspected, Moon refused to testify. The court allowed a detective to introduce Moon's out-of-court statements through the detective's testimony over Petitioner's continued objection.

The trial judge granted Petitioner's motion for judgment of acquittal on the theory that Petitioner "personally" committed the murder as charged in Counts 1-3; thus, only the lesser included offenses of Felony Murder were submitted to the jury on those counts. The jury found Petitioner guilty of the three counts of Felony Murder charged in Counts 1-3, three counts of Aggravated Murder as charged in Counts 4-6, Robbery in the First Degree with a Firearm, Burglary in the First Degree with a Firearm, Kidnapping in the Second Degree with a Firearm, two counts of Unauthorized Use of a Motor Vehicle, and Felon in Possession of a Firearm. The case proceeded to a sentencing phase, and the jury concluded the death penalty was not warranted on the Aggravated Murder convictions, and imposed a "true life" sentence.

The trial judge merged the three Aggravated Murder convictions for sentencing purposes and imposed the mandatory sentence of life without the possibility of parole. The judge also merged the Felony Murder, Robbery, Burglary, and Kidnapping convictions for sentencing and imposed a sentence of life with the

possibility of parole after 25 years, concurrent to the "true life" sentence.  The judge also merged the two Unauthorized Use of a Motor Vehicle convictions and imposed a 60-month sentence. Finally, the judge imposed a twelve-month sentence for the Felon in Possession of a Firearm conviction, which was an upward departure based on a  finding of greater-than-typical harm.

Petitioner filed a direct appeal.  The Oregon Court of Appeals affirmed without opinion and the Oregon Supreme Court denied review.  *State v. Davis*, 209 Or. App. 354, 147 P.3d 382 (2006), *rev. denied*, 342 Or. 299, 152 P.3d 902 (2007).

Petitioner then sought state post-conviction relief ("PCR"). Following an evidentiary hearing, the PCR trial judge denied relief.  Petitioner appealed, but again the Oregon Court of Appeals affirmed without opinion, and the Oregon Supreme Court denied review.  *Davis v. Nooth*, 241 Or. App. 352, 250 P.3d 38, *rev. denied*, 350 Or. 297, 255 P.3d 489 (2011).

On September 9, 2011, Petitioner filed his habeas corpus action in this Court.  The Court appointed counsel, and currently before the Court is Petitioner's First Amended Petition. Petitioner alleges four claims for relief:

> **Ground One:   Ineffective Assistance of Counsel:** Petitioner was denied effective assistance of counsel, in violation of the Sixth and Fourteenth Amendments to the United States Constitution, when his appellate attorney failed to diligently and conscientiously exercise professional skill and judgment and, as a result, Petitioner's case was prejudiced.

**Supporting Facts:** Appellate counsel failed to assign error on hearsay grounds to the trial-court admission of co-defendant Medero Moon's out-of-court statements inculpating Petitioner.  In addition to the other crimes at issue, Mr. Moon's hearsay statements formed the foundation of Petitioner's Aggravated Murder convictions.  However, the statements should not have been admitted, as they clearly constituted hearsay without an exception.  Appellate counsel only assigned error to the statements' introduction on Confrontation-Clause grounds.  Appellate counsel's failure prejudiced Petitioner.  Had appellate counsel raised this issue, it is more likely than not that the Oregon Court of Appeals would have reversed on appeal.

**Ground Two:  Violation of Confrontation Clause Rights**
Petitioner was denied his rights under the Sixth Amendment to the United States Constitution to confront and cross-examine a crucial prosecution witness.
**Supporting Facts:** The trial court's admission of Mr. Moon's incredibly damaging out-of-court statements violated Petitioner's Confrontation Clause rights because Petitioner did not have an opportunity to cross-examine Mr. Moon.  Mr. Moon's statements were "testimonial" in nature and their introduction formed the foundation of the prosecution's case.

**Ground Three:  Denial of Due Process and the Right to an Impartial Jury**
Petitioner was denied his rights under the Sixth and Fourteenth Amendments to the United States Constitution to Due Process and the right to an impartial jury.
**Supporting Facts:** The trial court erred in overruling [Petitioner's] challenge for cause of a juror.  Juror Duden was biased, and was incapable of being fair and impartial.  This was proven during voir dire, and defense counsel urged the court to dismiss the juror for cause.  However, the trial court failed to excuse juror Duden, allowing bias to taint the jury pool and verdict.

**Ground Four:  Denial of Equal Protection**
Petitioner was denied his right under the Fourteenth Amendment to the United States Constitution to equal protection of the laws.
**Supporting Facts:** Petitioner is an African-American.  He is entitled to the protections afforded to criminal

defendants under the Fourteenth Amendment and *Batson v. Kentucky*, [476 U.S. 79 (1986)]. The trial court erred in overruling Petitioner's challenge, under *Batson*, to the prosecution's elimination of African-Americans from the jury. The prosecution did not present an adequate race-neutral reason for excluding both prospective African-American jurors.

Respondent contends the claims alleged were denied in state court decisions that were not contrary to or involved an unreasonable application of clearly established federal law as determined by the United States Supreme Court. As such, Respondent argues Petitioner is not entitled to habeas corpus relief in this Court.

## **LEGAL STANDARDS**

Under 28 U.S.C. § 2254(d), an application for a writ of habeas corpus shall not be granted unless the adjudication on the merits in State court:

> (1) was contrary to, or involved an unreasonable application of, clearly established Federal law as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). In *Williams v. Taylor*, 529 U.S. 362, 386-389 (2000), the Supreme Court construed this provision to require federal habeas courts to be highly deferential to the state court decisions under review. In *Cullen v. Pinholster*, 131 S.Ct. 1388, 1398-1402 (2011), the Court reiterated the highly deferential nature of federal habeas review, and limited federal review "to

the record that was before the state court that adjudicated the claim on the merits."

"'Clearly established Federal law' is the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision." *Lambert v. Blodgett*, 393 F.3d 943, 974 (9th Cir. 2004), *cert. denied*, 546 U.S. 963 (2005). An "unreasonable application" of clearly established federal law occurs when "the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Lambert*, 393 F.3d at 974.

"The state court's application of law must be objectively unreasonable." *Williams*, 529 U.S. at 411. "[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the state court decision applied clearly established federal law erroneously or incorrectly." *Woodford v. Visciotti*, 537 U.S. 19, 24-25 (2002) (internal citations omitted).

"[A] habeas court must determine what arguments or theories . . . could have supporte[d] the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of this Court." *Pinholster*, 131

S.Ct. at 1402 (citing *Harrington v. Richter*, 131 S.Ct. 770, 786 (2011)). "A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington*, 131 S.Ct. at 786 (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)).

Section 2254(d) is a "'guard against extreme malfunctions in the state criminal justice systems, not a substitute for ordinary error correction through appeal.'" *Hibbler v. Benedetti*, 693 F.3d 1140, 1148 (9th Cir. 2012) (quoting *Harrington*, 131 S.Ct. at 786) (other internal quotation omitted), *cert. denied*, 133 S.Ct. 1262 (2013). "'[T]he question under AEDPA is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable — a substantially higher threshold.'" *Id*. at 1146 (quoting *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007)).

## DISCUSSION

### I.    Ground One:  Ineffective Assistance of Appellate Counsel

To prevail on a claim of ineffective assistance of counsel, petitioner must show both (1) that the attorney's performance fell below an objective standard of reasonableness; and (2) that the performance prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 687, 688 (1984). There is a strong presumption that

counsel's conduct falls within the wide range of reasonable professional assistance, or what "might be considered sound trial strategy." *Strickland*, 466 U.S. at 689. Reasonableness is judged as of the time of counsel's conduct, not in hindsight. *Id*. at 689-90.

A federal court reviews a state court's application of *Strickland* for reasonableness, not for correctness. *Id*. The federal court does not ask "'whether counsel's actions were reasonable'" but "'whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard.'" *Id*. (quoting *Harrington*, 131 S.Ct. at 788). "Accordingly, a 'doubly deferential judicial review' applies to *Strickland* claims rejected by the state court." *Id*. (quoting *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009)).

Claims of ineffective assistance of appellate counsel are also reviewed under the *Strickland* standard. *Smith v. Robbins*, 259 U.S. 259, 286 (2000); *Cockett v. Ray*, 333 F.3d 938, 944 (9th Cir. 2003). Thus, in order to prevail on an ineffective assistance of appellate counsel claim, a petitioner must demonstrate that his appellate counsel's performance fell below an objective standard of reasonableness, and that there is a reasonable probability that, but for counsel's unprofessional errors, the petitioner would have prevailed on appeal. *Robbins*,

528 U.S. at 258-59.  "Whether appellate counsel acted unreasonably in failing to raise a particular issue is often intertwined with the merits of the issue and whether the defendant would have prevailed."  *Hayes v. Woodford*, 301 F.3d 1054, 1086 (9th Cir. 2002); *see also Miller v. Keeney*, 882 F.2d 1428, 1434 (9th Cir. 1989) ("[a]ppellate counsel will therefore frequently remain above an objective standard of competence (prong one) and have caused her client no prejudice (prong two) for the same reason — because she declined to raise a weak issue").

Petitioner alleges appellate counsel provided ineffective assistance in his direct appeal because counsel failed to assign error on hearsay grounds to the admission of Medero Moon's out-of-court statements inculpating Petitioner.  In particular, Petitioner contends the detective's testimony that Moon said Petitioner told him, "that he knew what he had to do and that he had to kill the [decedent]" should not have been admitted under a hearsay exception.  Because it was the only evidence of Petitioner's alleged directive to Moon to shoot and kill the victim, Petitioner argues, had the testimony been excluded there would not have been sufficient evidence for the jury to find Petitioner guilty of any Aggravated Murder charges.

Petitioner argues the detective's recitation of Moon's statement should not have been admitted because it was not against Moon's penal interest and therefore did not fall within an

exception to the rule prohibiting hearsay.  Petitioner argues the statement was not against Moon's penal interest because the statement was made pursuant to an offer of leniency.

Petitioner's trial counsel proffered the same argument, which the trial judge twice rejected.  The trial judge specifically determined that the statements at issue were admissible under Oregon law.  *See* Resp. Exh. 104, Ex. Rec. pp.  8-11; Resp. Exh. 153, pp.  2-3.  The state trial court's determination that admission of Moon's statements through the detective's testimony fell within an exception to the hearsay rule is a state-law question, not subject to review by this Court.  *See Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991) ("[i]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions); *Mendez v. Small*, 298 F.3d 1154, 1158 (2002) (state courts have "the last word on the interpretation of state law").

The record before the PCR court established that appellate counsel evaluated the hearsay claim and determined that the stronger argument was that of a Sixth Amendment Confrontation Clause argument.  As counsel explained:

> I examined closely the use of Medero Moon's statements
> against petitioner at trial.  It was clear to me that
> Mr. Moon's statements about robbing a man and then
> shooting him in the head were statements against his
> legal interests, so I did not assign error on that
> basis.  However, it appeared to me that petitioner's
> confrontation rights were violated and I did assign

13 - OPINION AND ORDER -

error to use of Mr. Moon's statements on those grounds,
referencing *Crawford v. Washington*.

Resp. Exh. 144, p. 3.  The PCR court's decision that this did not
rise to the level of ineffective assistance of counsel was neither
contrary to nor an unreasonable application of *Strickland*.
Because the trial court ruled the evidence admissible, a
determination of state law that this Court must respect,
Petitioner cannot show he would have prevailed had appellate court
assigned error to the admission of the statements on hearsay
grounds.  Accordingly, Petitioner is not entitled to relief on his
ineffective assistance of appellate counsel claim.

## II.  Ground Two:  Violation of Confrontation Clause Rights

Petitioner alleges the introduction of Moon's hearsay
statements through the detective's testimony violated his federal
right of confrontation.  In *Crawford v. Washington*, the Supreme
Court held that in criminal proceedings, "[t]estimonial statements
of witnesses absent from trial [are admissible] only where the
witness is unavailable, and only where the defendant has had a
prior opportunity to cross-examine."  541 U.S. 36, 59 (2004).[1]

---

[1]Although Petitioner's case was tried before the United States
Supreme Court decided *Crawford*, and trial counsel's confrontation
clause objection was thus couched in terms of reliability, the
*Crawford* decision was issued shortly thereafter and the state
agreed on direct appeal that the issue was preserved and that
Moon's statements were "testimonial" under *Crawford*.  Resp. Exh.
105, p. 3).

It is undisputed that Petitioner never had an opportunity to cross-examine Moon with respect to the statements he made to the investigating officers.   Indeed, the parties agree that the introduction of Moon's out-of-court statements was a violation of the Confrontation Clause.   The parties, disagree, however, as to whether Petitioner suffered prejudice as a result.

Confrontation Clause errors are subject to harmless error analysis under the *Brecht* standard, which asks whether the error had a substantial and injurious effect or influence in determining the jury's verdict.   *See Ocampo v. Vail*, 649 F.3d 1098, 1114 (9th Cir. 2011) (discussing *Crawford*, and citing *Brecht v. Abrahamson*, 507 U.S. 619, 623 (1993)), *cert. denied*, 133 S.Ct. 62 (2012).   "In general, the inquiry into whether the constitutionally erroneous introduction of a piece of evidence had a substantial and injurious effect is guided by several factors: 'the importance of the testimony, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony, the extent of cross-examination permitted, and the overall strength of the prosecution's case.'" *Ocampo*, 649 F.3d at 1114 (quoting *Whelchel v. Washington*, 232 F.3d 1197, 1206 (9th Cir. 2000)) (additional citations omitted).

Petitioner argues that without Moon's statement, the state's case essentially rested on Jessica Rydman's testimony, and, therefore, her credibility.   Moreover, Petitioner alleges that

15 - OPINION AND ORDER -

Moon was able to tailor his statements to match up with Rydman's, because Moon had access through discovery to her version of events before Moon made his statements.   Finally, Petitioner argues Moon's statement that Petitioner told him "he knew what he had to do and that he had to kill the [decedent]" was the only direct link between Petitioner and Moon's act of killing the victim.

Upon a review of the record, however, the Court concludes that even if Moon's statement had been excluded, ample evidence supported the jury's finding of guilt.   First, Jessica Rydman's testimony largely paralleled Moon's statements to the police. Both stated the crime began after Rydman returned from her "date" with the victim and told Petitioner the victim was a banker who appeared to have a lot of money.   Both described the crime in much the same way, with Rydman driving the trio to the victim's house, Rydman ringing the bell or knocking on the door, Petitioner and Moon rushing in and ordering the victim to the floor after the victim answered the door, Petitioner and Moon taking turns guarding the victim at gunpoint while the others ransacked the house, and Moon eventually shooting the victim in the head before they all sped off in the victim's and Rydman's cars.

In addition to Rydman's account, other evidence supported the jury's guilty verdict.   There was no doubt that Moon shot the victim and that Petitioner knew that.   Moon told a friend that he, Petitioner, and Rydman had robbed a banker, that Rydman had set it

up, and that Moon had shot the banker.  After the crime, while they were splitting up the victim's property at Rydman's house, Petitioner asked Moon if he was certain that he had killed the victim, and had Moon demonstrate exactly what he had done.

The state produced Rydman's neighbor, who sold a 9 mm gun (the same caliber as the murder weapon) to Petitioner.  The neighbor disposed of the gun in the Columbia River after Petitioner brought it back, saying he had "hit a lick" (committed a robbery), and needed to get rid of it.  As partial payment, Petitioner gave the neighbor a watch.  The victim's watch was found in the neighbor's room.

The state also called Rydman's friend and babysitter, who helped Rydman use the victim's credit cards at ATM machines and to buy clothing.  Rydman told her friend that after a "date" she, Petitioner, and Moon had gone back to the date's house and had robbed him.  Eventually she admitted that Moon had shot the victim.  Rydman showed her friend jewelry and watches stolen from the victim.

Some of the victim's stolen property, along with a note with his credit card and other information, were found at the house Rydman and Petitioner shared.  The victim's cars, including one sent over a cliff in North Portland and the other left parked on the street, were found where Rydman and Moon said they would be.

17 - OPINION AND ORDER -

Moreover, Petitioner made damaging statements himself. According to Rydman's daughter, sometime after the crime while they were in Los Angeles and after they learned that Rydman's house had been searched by the police, Petitioner was angry at Rydman. He said she was stupid for leaving stuff at her house from "that guy." Also, Petitioner, Rydman, and Moon fled the state after the crime, first to Las Vegas and then to Los Angeles. Petitioner attempted to concoct an alibi for the night of the crime. In addition, Petitioner attempted to convince Moon to testify that Petitioner was not there the night of the crime, despite the overwhelming evidence that he was.

Further, Petitioner's guilt on the charges of Aggravated Murder upon which the jury convicted him did not depend on whether he was "the leader" or on whether he told Moon to shoot the victim. To the extent Petitioner argues that the only evidence the victim was killed to conceal the perpetrator's identities is his statement to Moon telling him that he knew what he had to do, the argument is without merit. The goal of concealing identities is apparent from the fact that the perpetrators wore gloves at the crime scene, that during the robbery they kept the victim face-down on the floor (and, for at least some period of time), blind-folded, that they ultimately killed the victim, and that they subsequently disposed of the victim's vehicles and fled the state.

As the evidence in the record makes clear, even in the absence of Moon's hearsay statements, the record contained ample evidence that Petitioner committed the crimes for which the jury found him guilty.  As such, the hearsay statements did not have a substantial and injurious effect upon his trial, and the state court decisions denying relief on Petitioner's *Crawford* claim are neither contrary to, nor unreasonable applications of, clearly established federal law.

**III. Ground Three:  Denial of Right to an Impartial Jury**

In Ground Three, Petitioner alleges the trial judge erred in denying Petitioner's objection to a challenge for cause of Juror Duden.  Petitioner argues Juror Duden firmly believed she could not vote for acquittal unless petitioner presented evidence in his own defense.

The relevant test for determining whether a juror is biased is "whether the juror[ ] . . . had such fixed opinions that [the juror] could not judge impartially the guilt of the defendant. *Patton v. Young*, 467 U.S. 1025, 1035 (1984) (citing *Irvin v. Dowd*, 366 U.S. 717, 723 (1961)).  As the Supreme Court explained in *Patton*, the question whether a juror is impartial "is plainly one of historical fact: did a juror swear that he could set aside any opinion he might hold and decide the case on the evidence, and should the juror's protestation of impartiality have been believed." *Patton*, 467 U.S. at 1036 (citation omitted).  Because

a trial court's finding that a juror is impartial is a factual finding, it is entitled to "special deference." *United States v. Quintero–Barraza*, 78 F.3d 1344, 1350 n. 5 (9th Cir. 1995); *see also Patton*, 467 U.S. at 1037 n.12 (whether a juror can in fact lay aside his opinion and render a verdict based on the evidence presented in court is a determination to which habeas courts owe special deference).

At the outset of her questioning by trial counsel, Juror Duden appeared to believe that a defendant should have to produce some evidence of innocence. She agreed with defense counsel's suggestion, taken from her answer to a juror questionnaire, that she thought a defendant should be required to produce evidence of innocence, and also said that she should not find someone not guilty, if she "couldn't hear from them." Trans. Vol. 3, p. 69.

Juror Duden was clearly confused about the concept that a criminal defendant has no obligation to put on evidence. However, after some explanation from the prosecutor and the trial judge, Juror Duden unambiguously affirmed that she could follow the court's instructions if the court told her that a defendant has no such obligation:

> PROSECUTOR: * * *
>
> And what I believe [trial counsel] is trying to make sure is that you won't hold it against them if they don't put on any evidence, because unlike us, they don't have to put on any evidence.

DUDEN:  Right.  And you do.

PROSECUTOR:  Right.

DUDEN:  Okay.

PROSECUTOR:  So would you be able to do that; would you be able to follow the law that Judge Bearden just talked to you about, and not hold it against them if they don't put on any evidence?

DUDEN:  Yeah, I would be able to do that.

Trans., Vol. 3, p. 103.

Defense counsel moved to challenge Duden for cause, but the trial judge denied the challenge.  He explained:

THE COURT:  Well.  I'll deny your motion.  Basically, when she made that statement [indicating that a defendant should have to produce evidence], I had written down the fact that she was only getting a portion of the perspective of how that works, and her answer is rather typical to the answers I've heard from jurors over the years, when they are asked the question as to whether or not, if the defendant puts on no evidence at all, would they be able to find the defendant guilty.  Most of them say "no" because they don't realize that the State has the burden, what burden is, what elements of the charges are, and the level of proof, that sort of thing.  And until they're told the law and explained the reason why, their answer is incomplete, in my estimation.  And I think she finally understood and, given examples, she indicated that, in fact, quite emphatically by her body language that if the State didn't prove the case, or missed an element, and she was asked whether or not she could find the defendant not guilty, she basically said:  How could I not?  Yes.

So I'm satisfied that, given the proper legal instructions as to what her position is, she will follow the law.  She may be predisposed a little bit one side or the other, but that's always going to happen.  In fact, she's fairly candid.

Trans., Vol. 3, pp. 115-16.

The trial judge's factual determination that Juror Duden through her body language and testimony demonstrated she could fairly and impartially decide the case based on the evidence presented in court is presumed correct under § 2254(e)(1). *Smith v. Phillips*, 455 U.S. 209, 218 (1982). Petitioner has not presented evidence to meet his burden of rebutting the presumption of correctness by clear and convincing evidence. Accordingly, Petitioner is not entitled to habeas corpus relief on the claim alleged in Ground Three.

**IV. Ground Four:  Denial of Equal Protection**

Finally, in Ground Four, Petitioner alleges the trial court violated his equal protection rights by overruling Petitioner's challenge under *Batson v. Kentucky*, 476 U.S. 79 (1986) to the prosecution's elimination of African Americans from the jury. Petitioner argues the prosecution did not present an adequate race-neutral reason for excluding two prospective African-American jurors.

"[T]he Equal Protection Clause forbids the prosecutor to challenge potential jurors solely on account of their race or on the assumption that black jurors as a group will be unable impartially to consider the State's case against a black defendant." *Batson*, 476 U.S. at 89; *Miller-El v. Dretke*, 545 U.S.

231, 238 (2005).   In order to prevail on a *Batson* claim, a defendant must first make a *prima facie* showing that he is a member of a cognizable racial group and the prosecutor exercised the peremptory challenge to remove potential jurors of the defendant's race. *Batson*, 476 U.S. at 96-98.  This first step is satisfied merely by producing evidence sufficient to permit the trial judge to draw an inference that discrimination has occurred. *Johnson v. Finn*, 665 F.3d 1063, 1070-71 (9th Cir. 2011).

If the defendant makes such a showing, the burden shifts to the prosecutor to come forward with a race-neutral explanation for the challenge. *Batson*, 476 U.S. at 96-98; *Miller-El*, 545 U.S. at 239.   "Although the prosecutor must present a comprehensible reason, the second step of this process does not demand an explanation that is persuasive, or even plausible, so long as the reason is not inherently discriminatory." *Rice v. Collins*, 546 U.S. 333, 338 (2006) (internal quotations omitted).   The court must then determine whether the defendant has established purposeful discrimination. *Batson*, 476 U.S. at 98; *Rice*, 546 U.S. at 338; *Miller-El*, 545 U.S. at 239; *Cook v. Lamarque*, 593 F.3d 810, 814 (9th Cir. 2010).

Under this three-part test, the court ultimately must determine "whether race was a substantial motivating factor - that is, whether the defendant has shown purposeful discrimination at

*Batson's* third step." *Cook*, 593 F.3d at 815 (internal quotations omitted).  "'If a prosecutor's proffered reason for striking a black panelist applies just as well to an otherwise-similar nonblack who is permitted to serve, that is evidence tending to prove purposeful discrimination to be considered at *Batson's* third step.'" *Cook*, 593 F.3d at 815 (quoting *Miller-El*, 545 U.S. at 241); *Kesser v. Cambra*, 465 F.3d 351, 360 (9th Cir. 2006).

The *Batson* inquiry turns largely on an evaluation of credibility. *Felkner v. Jackson*, 131 S.Ct. 1305, 1307 (2011). The best evidence of discriminatory intent often will be the demeanor of the prosecutor, and the race-neutral reasons for peremptory challenges often will require the trial court to evaluate whether the juror's demeanor can credibly be said to have exhibited the basis for the strike. *Snyder v. Louisiana*, 552 U.S. 472, 477 (2008).  In the habeas context, this court defers to the state court's conclusion that the prosecutor did not engage in purposeful discrimination unless it is an unreasonable determination of the facts in light of the evidence presented in the State court proceeding. *Felker*, 131 S.Ct. at 1307; *Rice*, 546 U.S. at 338-39; *Miller-El*, 545 U.S. at 240; *Cook*, 593 F.3d at 816 & n. 3; 28 U.S.C. § 2254(d)(2).  The controlling issue is whether a reasonable jurist could find it was unreasonable for the trial judge to go the way the trial judge went. *Ben-Sholom v. Ayers*,

674 F.3d 1095, 1103 n. 4 (9th Cir. 2012), *cert. denied*, 133 S.Ct. 850 (2013).

Here, when the prosecutor exercised a peremptory challenge to excuse the second of two African-Americans from the jury, defense counsel objected.  The trial judge then correctly, and at some length outlined the analytical process described above.  The judge asked defense counsel to make his *prima facie* case of discrimination.  Defense counsel replied that the parties had questioned "two black jurors in the 60-plus jurors" that had been considered to that point.  The first "was Ms. Mangum who was passed for cause in that case, and was peremptorily removed by the state."  The second was prospective juror Willis.  Defense counsel suggested that there could be no explanation for the state's peremptory challenge to Mr. Willis "other than this gentleman has been removed because of his race."  Defense counsel added that Petitioner "is a black male," who wanted African-American jurors on the panel.

The trial judge concluded the defense made the requisite "*prima facie* showing when all of the African-American jurors were challenged."  He then asked the state for its "race-neutral statement."  The prosecutor responded:

> PROSECUTOR:  We removed [Mr. Willis] because, as the Court could tell, this man was -- for two reasons. One, this man was very close to saying that he could hardly -- in no circumstances believe testimony coming from Moon, and he struggled just a little less on

Rydman.  I mean, he came very close -- I don't know how
the bare record is going to reflect the length of his
agonizing decision over whether he could ever accept the
testimony of a person who is the actual shooter who
testified under a plea agreement.

Moreover, we removed him because, under the system
that we've been going on here, we've been able to voir
dire the jurors that would take his place.  And those
are all preferable.  It was obvious to anybody who
examined the voir dire of the three potential jurors,
including one black juror -- that could have
potentially, you know, come in with the State
challenging him, that they were all better for the State
than he was.

Trans., Vol. K, p. 117.

The trial judge determined the prosecutor had given a race-
neutral reason for challenging Willis, and then turned to the
question "as one of fact."  The judge noted that the facts that
the prosecutor "put into the record are facts that I recall from
the voir dire testimony, and I do recall [Willis] struggling with
the problem of believing either of the accomplices."  Trans., Vol.
K, p. 118.  The judge stated he could not "find any factual basis
in the record or in the voir dire or any other explanation to
disagree."  *Id*.  An African-American woman was subsequently seated
on the jury, first as an alternate, and then as a member of the
panel.

Petitioner does not dispute the trial judge's finding as to
the prosecutor's challenge to potential juror Willis.  Instead,
Petitioner argues the trial court erred in not demanding a race-

neutral explanation from the prosecutor for excluding the first African-American, Ms. Mangum.

When defense counsel referred to the peremptory challenge exercised by the prosecution to remove juror Mangum, he did so as part of his *prima facie* case of discrimination based on what he saw as a pattern of state strikes against African-American jurors, not necessarily because he was objecting to her removal *per se*. In any event, even in the absence of an explicit race-neutral explanation for removal of one juror, the trial judge's decision that no *Batson* violation occurred was not objectively unreasonable. *See Yee v. Duncan*, 463 F.3d 893, 901 (9th Cir. 2006) (where record, including voir dire testimony, suggested a gender-neutral reason for challenge, the fact that the prosecutor could not remember and articulate specific race-neutral reasons for challenging juror was not a *per se* violation of equal protection rights), *cert. denied*, 552 U.S. 1043 (2007).

Finally, as noted, an African-American woman was ultimately seated on the jury. Although not dispositive, the fact that the jury included minorities may be considered indicative of a nondiscriminatory motive. *Turner v. Marshall*, 121 F.3d 1248, 1254 (9th Cir. 1997); *see also Gonzalez v. Brown*, 585 F.3d 1202, 1210 (9th Cir. 2009) (citing *Turner* for the proposition that the fact that African-American jurors remained on the panel "may be

considered indicative of a nondiscriminatory motive"); *see also United States v. Cruz-Escoto*, 476 F.3d 1081, 1090 (9th Cir. 2007) (considering that the seated jury included two Hispanics who were not struck by the government and that the government still had remaining peremptory challenges); *Cooperwood v. Cambra*, 245 F.3d 1042, 1048 (9th Cir. 2001) (as amended) (considering the final composition of the jury in determining that the petitioner did not raise a reasonable inference of racial bias for purposes of establishing a *prima facie* showing); *Burks v. Borg*, 27 F.3d 1424, 1429 (9th Cir. 1994) (explaining that the prosecutor's acceptance of minorities on the jury is a valid, though not necessarily dispositive, consideration in determining whether a prosecutor violated *Batson*).

The trial judge and the Oregon appellate courts' decision that no *Batson* violation occurred was not objectively unreasonable. Accordingly, Petitioner is not entitled to habeas corpus relief on his equal protection claim alleged in Ground Four.

/ / / / /

/ / / / /

/ / / / /

/ / / / /

## **CONCLUSION**

For these reasons, the Court DENIES the First Amended Petition for Writ of Habeas Corpus (#17) and DISMISSES this action.

IT IS SO ORDERED.

DATED this 22nd day of November, 2013.


/s/ Anna J. Brown

_____
ANNA J. BROWN
United States District Judge